**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HEATHER HINTERBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-317-SJM |
| v. | ) | |
| | ) | |
| IROQUOIS SCHOOL DISTRICT | ) | |
| and SALLY LOFTUS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

In March of 2004, Plaintiff Heather Hinterberger was seriously injured while attempting a stunt as a member of the Iroquois High School cheerleading squad. She later filed a civil action in the Erie County Court of Common Pleas against her cheerleading coach, Sally Loftus, and the Iroquois School District. On November 17, 2008, the case was removed from the court of common pleas to this Court.

At this procedural juncture, Hinterberger's sole remaining cause of action against the Defendants is a claim under 42 U.S.C. § 1983 based on the alleged violation of her federal substantive due process rights. This Court's subject matter jurisdiction is premised upon 28 U.S.C. §§ 1331, 1343, and 1441(a).

Presently pending before me in the above-captioned case is a renewed motion by the Defendants for summary judgment. For the reasons set forth below, the motion will be granted in part and denied in part.

1

# I.    BACKGROUND[1]

Plaintiff suffered a serious closed head injury on March 3, 2004 while attempting to perform a cheerleading stunt known as a "twist down cradle."  At the time, the Plaintiff was a freshman at Iroquois High School ("IHS"), and she had been a member of the cheerleading squad for approximately six months.  The incident occurred in the Lawrence Park Elementary School Large Group Instruction ("LGI") room, where the squad often practiced.

Cheerleaders perform cheers, dances, stunts and pyramids.  When stunts are performed, there are normally three or four cheerleaders acting as the "base" and one cheerleader acting as the "flyer."  The flyer is the member who is elevated into the air by the base and performs the pose, twist, cradle or other maneuver.  Those cheerleaders acting as the base are the ones who hold, elevate, and catch the flyer during the stunt.  Plaintiff was a flyer with the IHS cheerleading squad at the time of the incident giving rise to this lawsuit.

In addition to the flyer and the "bases," the IHS cheerleading squad typically used members of the squad to act as "spotters" when practicing new and un-mastered stunts.  Spotters are intended to enhance safety by encircling the bases and the flyer.  The idea is that, if a stunt goes awry and the bases appear unable to steady or catch the flyer, the spotters are positioned so as to step in and attempt to do so.  To this end, the spotters on the IHS squad were instructed to keep their attention focused on the flyer if

---

[1] The following background facts are taken largely from the Defendants' Concise Statement of Material Facts in support of its motion for summary judgment [34], the Plaintiff's response thereto and statement of additional material facts [43], and the Defendants' Response to Plaintiff's Statement of Additional Material Facts [62].  Except as otherwise noted herein, the following facts are undisputed. Where facts are disputed, we accept the version most favorable to the Plaintiff.

she appeared to be falling away from the base. Spotters were further instructed to maneuver themselves between the flyer and the floor if the flyer appeared to be falling.

While a member of the IHS cheerleading squad, Plaintiff participated in both regular and competition cheerleading. Both squads were comprised of identical members with the exception of one individual. Both squads performed the same cheers and routines.

Plaintiff was injured on March 3, 2004 while practicing a "twist down cradle" -- a stunt which was being introduced to the squad for the first time on that day.[2] At the time, Plaintiff was acting as the squad's flyer, a position she had had no experience with prior to trying out for the IHS cheerleading squad in the 8th grade.

The twist down cradle is considered an "intermediate level" stunt for high school cheerleading and, at the time of the incident in question, was commonly used in high school cheerleading competitions. The IHS cheerleaders had in fact observed the maneuver being performed by numerous other squads at a cheerleading competition held in July 2003 in Darien Lake, New York. Following this event, several of the IHS squad members asked Defendant Loftus to allow them to add the move to their own routine.

Despite these requests, Loftus did not allow her squad to attempt the twist down cradle until their practice on March 3, 2004, some seven months after the Darien Lake competition, because she did not feel the squad was ready to add the maneuver to its routine prior to that point. In the meantime, Loftus arranged to have a cheerleader from

---

[2] Although there is conflicting evidence on this point, we assume the version of facts most favorable to the Plaintiff.

3

another program who was experienced in the twist-down cradle attend the March 3, 2004 practice so that she could demonstrate the maneuver and assist in teaching the cheerleaders the proper technique.

Specifically, Loftus called upon Jessica James, a flyer form the McDowell High School cheerleading program, to help demonstrate and instruct the IHS squad on proper twist down cradle technique. Miss James had participated as the flyer in both regular and competition cheerleading at McDowell and acted as the Assistant Coach for a local middle school cheerleading program. According to Plaintiff's expert, William Brazier, the McDowell cheerleading program is recognized as being exceptionally well organized and well coached.

In accordance with Loftus's request, James attended the IHS cheerleading practice on March 3, 2004. After demonstrating the twist down cradle for the cheerleaders, James remained for the balance of the practice to help instruct the IHS squad regarding the maneuver.

The twist down cradle involves a four-person base comprised of two "sides," a "front" and a "back." The two "side" bases first elevate the flyer to the designated stationary level (depending on whether the stunt is being performed at the half-extension level or the full-extension level); they then thrust or "pop" the flyer upward and release her into the air. The flyer, once propelled upward and released into the air, performs one or more complete revolutions or twists of her body before landing in the arms of her base in a "cradle" or seated "pike" position with her legs together and extended straight out in front of her and her arms straight out from her sides at shoulder level. When performing this maneuver at the half-extension level, the flyer is elevated

and made stationary in a position whereby she is standing upright on the hands of the side "bases" with her feet at the bases' shoulder level. When performing at the full-extension level, the flyer is elevated such that she stands upright on the side bases' hands with their arms fully extended upward and overhead before being released into the air. In either case, all of the twisting is done by the flyer; the job of the bases is to elevate and pop the flyer into the air so that she can perform the twist. The twist down cradle can be performed with the flyer executing one rotation or multiple rotations.

On the date in question, Plaintiff was not feeling well but did not inform Loftus of this fact and opted to participate in cheerleading practice. According to Plaintiff, she was aware that the twist-down cradle was going to be introduced at practice that day and she felt pressured to attend and attempt the stunt, since the squad was getting ready for a national competition in South Carolina and needed to add the move to their routine so that they could score more points.[3] However, she did not express these thoughts to Loftus.

After James had demonstrated the twist down cradle, Plaintiff and her bases performed the maneuver approximately a half-dozen times, while Loftus supervised and James observed. Each attempt was performed from the full-extension, rather than the half-extension, position. It was Plaintiff's first day trying the maneuver and at least one witness described her as having a "hard time" with it.

---

[3] In February 2004, Loftus had been granted permission by the School Board for the squad to attend and participate in a national cheerleading competition to be held in Myrtle Beach, South Carolina in April 2004. The squad had attended this competition the previous year. The squad was practicing the twist down cradle on March 3, 2004 in anticipation of the upcoming competition.

On each of Plaintiff's attempts to perform the twist down cradle – including her last, spotters surrounded the Plaintiff and her base. By one account, 6 to 8 spotters were utilized during these attempts.

Plaintiff does not personally recall what happened to her on her last attempt after the moment when she was elevated and waiting to be released upward. Although eyewitness accounts vary as to what exactly occurred when Plaintiff was popped for the last time by her base, there is no dispute that she flew over and outside the perimeter of her base and her spotters, striking first her left hip, then her left shoulder, then her head on the LGI room floor. As a result, Plaintiff suffered a severe closed head injury.

At the time that Plaintiff struck the floor, there was no matting in place. The only mats then available for the cheerleaders' use in the Lawrence Park Elementary School LGI room were vinyl tri-fold mats which had a tendency to slip or slide during stunting. These 6 x 8 feet mats were approximately 2 and ½ inches thick. They were not stored in the LGI room but were kept in a locked storage area inside the boy's locker room at the elementary school, which sometimes made access difficult.

On occasion, cheerleading practices would be held in the IHS gym with the use of wrestling mats, or outside the school. However, due to the number of PIAA-sanctioned athletic programs conducted by the Iroquois School District and the competing demands for gym space, the cheerleaders were often relegated to practicing in the Elementary School's LGI room. Although this room had high ceilings conducive to stunting, the floor was described as "very hard" and likely consisted of concrete covered by industrial grade carpeting with little or no padding. Cheerleading practices were held in this room under the direct supervision of Loftus and with the knowledge

6

and permission of the High School's Athletic Director -- James Vogt, the High School and Elementary School Principals, the School District's Superintendent, and the Iroquois School Board.  The School District's administrative office, in which the Superintendent's office was located, was approximately ten feet down the hall from the LGI room.

Prior to Plaintiff's injury, Defendant Loftus had requested of Vogt that additional mats be provided for the cheerleaders' use.  As Athletic Director, Vogt was Loftus' direct supervisor.  Loftus specifically asked Vogt for better access to the existing mats and for better mats for stunting purposes.  She explained that the existing mats were a hazard due to their tendency to slide when used for stunting practice and that they were not the type of mats that the squad needed in order to be successful in their stunting.  In response, Vogt mentioned money as an issue and told Loftus to use what mats were available, as that is what had always been used.  It does not appear that Vogt ever conveyed Loftus's requests for better mats, or her concerns over the existing mats, to the School Board.  For that matter, the Plaintiff admits that the School Board never received a formal request from the school administration for the purchase of additional mats for cheerleaders' use in the LGI room prior to Plaintiff's injury.

Prior to March 3, 2004, there had been some incidents involving bruises, strains and sprains to various members of the IHS cheerleading squad, but nothing as severe as the injury Plaintiff sustained on March 3, 2004.  Plaintiff had personally gone to the emergency room on two different occasions to seek treatment for what amounted to sprains and/or bruising to her wrist and shoulder.  She was not admitted for treatment

on either occasion. According to Plaintiff's mother, Pamela C. Hinterberger, these injuries were the result of Plaintiff being dropped during attempted stunts.

There is also evidence that Amanda Reitz, one of Plaintiff's fellow flyers on the squad, experienced minor injuries as the result of being dropped during stunting. On one particular occasion during the 2003-2004 school year, but prior to March 3, 2004, Reitz was participating as a flyer during the squad's performance at a basketball game. The game was played at another school's gym and no matting was provided. During the course of a stunt, one of Reitz's bases turned away, causing Reitz to fall on her back and strike her arm on a grid-like structure. The incident resulted in some bleeding and bruising, but Reitz continued to perform with her squad for the remainder of the game and did not seek medical attention. She took ibuprofen and recovered after a couple of days.

Reitz also recalled seeking medical treatment on one occasion due to "pulling something" in her back. Reitz believed her back problem was probably the result of being caught so much and falling. She described the mats used by the squad as "[not] exactly the thickest, so when you hit them, you didn't feel the greatest…" (Reitz Depo., Ex. 2 to Defs.' Renewed Mot. for Summ. Judg. [75-6] at p. 9 of 22.)[4] Upon seeking medical treatment, she received a muscle relaxant and Tylenol 3 for her injury.

Reitz states that, on more than one occasion, she expressed to Loftus her concerns about practicing outside or in the LGI room without matting. Reitz's mother also had discussions with Loftus at some point prior to March 3, 2004 about the lack of

---

[4] All citations to the record refer to the official court pagination located within the header of the referenced document rather than to the original pagination located internally within the document.

sufficient matting. In response, Loftus advised that she had attempted to obtain better mats but had been turned down by Vogt. Reitz's concerns about her own safety resulted in her quitting the cheerleading squad just a couple of weeks prior to the national competition and just days before Plaintiff suffered her head injury. According to Reitz, she advised Loftus that she was not comfortable doing stunting without proper matting in place and that she was tired of getting injured. Reitz claims that this conversation occurred when the squad was practicing in the LGI room without mats.

According to another member of the IHS squad by the name of Faith Kindig, a group of the IHS cheerleaders, while walking to the March 3, 2004 practice, discussed their concern that mats would not be used at practice that day. There is no evidence to suggest that this concern was shared with Loftus on that date.

The Pennsylvania Interscholastic Athletic Association (PIAA) is the official body that issues rules concerning public high school sports in Pennsylvania. Its function is to "develop and enforce rules regulating interscholastic athletic competition," "[o]rganize, develop, and direct an interscholastic athletic program which will promote, protect, and conserve the health and physical welfare of all participants," and "[p]romote uniformity of standards in all interscholastic athletic competition." (PIAA Constitution, Article II.) Cheerleading is not an activity sanctioned by the Pennsylvania Interscholastic Athletic Association, as it is not recognized as a sport. Accordingly, neither the PIAA nor the Commonwealth of Pennsylvania have adopted any rules or regulations regarding the conduct of high school cheerleading practices, performances, or competitions. More specifically, neither the PIAA nor the Commonwealth of Pennsylvania have adopted any rules, regulations, or standards regarding (i) the use of mats at cheerleading practices,

9

performances or competitions, (ii) surfaces appropriate for cheerleading, (iii) stunts that are permissible or impermissible, or (iv) the training or certification of high school cheerleading coaches.

Under Pennsylvania law, however, the IHS School Board was charged with responsibility for "prescribing, adopting and enforcing such reasonable rules and regulations as it may deem proper" for the "management, supervision, control or prohibition of exercises, athletics, or games of any kind … and other activities related to the school program." 24 Pa. C.S.A. §5-511. That same law empowers the board of school directors to "… authorize any school employe or employes to manage, supervise and control the development and conduct of any of such activities," and "employ or assign any school employe to serve in any capacity in connection with any of such activities." *Id.* at §5-511(c)(2) and (3).

Throughout the nation there exist a few private organizations which issue guidelines specifically for cheerleading, including the American Association of Cheerleading Coaches and Administrators ("AACCA") and the National Federation of High School Associations ("NFHS"). These organizations have no regulatory authority in Pennsylvania. Some of the guidelines issued by the NFHS relative to sanctioned PIAA sports have been adopted by the PIAA; however, the adoption of these guidelines has been selective rather than wholesale. The PIAA has elected to adopt rules for certain sports and not others. Regarding some sports, the PIAA has adopted rules of the NFHS with modifications.

Both the NFHS and the AACCA issue guidelines for cheerleading on a yearly basis. The 2003-2004 version of the NFSH's "Spirit Rules Book" set forth various "Regulations for Coaches" including, in relevant part, the following:

1. Spirit squads should be placed under the direction of a knowledgeable coach.

2. The coach must be knowledgeable in first aid techniques and emergency procedures. Coaches must develop an emergency plan for dealing with injuries at practice, games, performances and competitions. Participants must be made aware of these procedures.

3. Coaches must remain up-to-date on all new techniques, progressions and safety regulations by frequently attending conferences, clinics and rules meetings. The coach should also belong to appropriate professional spirit organizations.

***

9. All spirit activities must be held in a location suitable for spirit activities with the use of mats, free of obstructions, and away from excessive noise or distractions.

***

11. Coaches should recognize a team's particular ability level and limit its activities accordingly. "Ability level" refers to the team's talents as a whole, and to individuals who should not be pressed to perform specific activities nor be limited by the ability level of the team.

***

13. Coaches and participants must be trained in proper spotting techniques.

14. Proper progression, spotting techniques and matting must be used until stunts are mastered.

(See Ex. 1-B to Defs.' Renewed Mot. for Summ. Judg. [75-4] at p. 35.) In addition, Rule 2, §1, Article 4 of the NFHS 2003-2004 Spirit Rules Book, pertaining to "General Risk Management," directs that: "Stunts (mounts, pyramids, tosses and tumbling) must be modified to be appropriate to the performing surface/area." (See Rule 2, § 1, Art. 4 at id., p. 9.)

11

According to Plaintiff's expert, William E. Brazier, the NFHS spirit rules "have been widely-accepted and used by high school cheerleading programs around the country since prior to Ms. Hinterberger's injury." (Ex. 17 to Pl.'s Br. in Opp. to Defs.' Mot. for Summ. Judg. [55-1] at p. 2.) It is Mr. Brazier's opinion that the Defendants should have, but failed to, adhere to the "regulations and/or guidelines" enumerated above. (*Id.* at p. 1.)

The AACCA issued somewhat similar Cheerleading Safety Guidelines for students high school age and younger for the year 2003-2004. Included within the manual's "General Guidelines" are the following:

1. Cheerleading squads should be placed under the direction of a qualified and knowledgeable advisor or coach.

2. All practice sessions should be supervised by the coach and held in a location suitable for the activities of cheerleaders (i.e., use of appropriate mats, away from excessive noise and distractions, etc.).

\*\*\*

5. Professional training in proper spotting techniques should be mandatory for all squads.

\*\*\*

9. Tumbling, partner stunts, pyramids and jumps should be limited to appropriate surfaces.

(Ex. X to Def.'s Mot. for Summ. Judg. [40-6] at pp. 5-6.)

In addition to its annual safety guidelines, the AACCA periodically publishes a more in-depth cheerleading safety manual. The most recent version of this manual which would have applied at the time of Plaintiff's injury was published in 1997. This version included a set of ten (10) safety guidelines pertaining specifically to "cheerleading mats." Among them is the following:

12

**6. Use additional mats where appropriate.**
   Whenever new and are [sic] difficult skills are being performed, provide
   additional matting where appropriate.  As skill proficiency increases,
   the amount of matting can be decreased accordingly.

(Ex. 1-A-1 to Defs.' Renewed Mot. for Summ. Judg. [75-2] at p. 37.)  Mr. Brazier opines

that the Defendants' actions also contravened the foregoing AACCA guidelines.

In January of 2009, the NFHS enacted a change to its guidelines which placed

specific restrictions on the performance of double-rotation twist down cradles – i.e, twist

down cradles involving two rotations of the body.  According to a February 10, 2009

press release issued by the NFHS, as of the 2009-2010 season, "a twist to a cradle that

involves more than one rotation will be permitted only on appropriate mats or grass, as

well as rubberized and soft-yielding surfaces."  (See Ex. U to Defs.' Mot. for Summ.

Judg. [40-3] at p. 1.)  A spokesperson for the NFHS is quoted in this release explaining

that, "As with basket tosses, the double twist to a cradle, commonly known as the

'double down,' cannot be done on a basketball court, unless the stunt is done on an

appropriate mat."  *(Id.*)

The NFHS has never issued any similar restriction applicable to a single-rotation

twist down cradle.  Thus, even under present NFHS guidelines, there is no restriction

specifically prohibiting the performance of a single-rotation twist down cradle on a

basketball court or other unmatted surface.  Similarly, the guidelines issued by the

AACCA do not expressly forbid the performance of a single-rotation twist down cradle in

the absence of matting.

Plaintiff considers the foregoing restrictions to be consistent with her

interpretation that matting is required during the learning of any new and unmastered

stunt – including a single rotation twist down cradle, but matting is not necessarily required once a stunt like the single twist down is mastered and being performed in public venues such as basketball games. The new restriction, according to Plaintiff's interpretation, simply means that double twist down cradles may never be performed at the high school level in the absence of matting – even when the stunt has been "mastered" and is being performed in a public venue.

Based on the foregoing facts, Defendants have moved for summary judgment as to each of Plaintiff's §1983 claims. Plaintiff has filed her brief in opposition, and the Court has received extensive briefing and argument, making the issues ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a); *Beers–Capitol v. Whetzel*, 256 F.3d 120, 130 n. 6 (3d Cir.2001).

## III.    DISCUSSION

Plaintiff's claim is brought pursuant to 42 U.S.C. § 1983,[5] which does not create substantive rights but instead "provides only remedies for deprivations of rights

---

[5] This statute provides a private right of action as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [U.S.] Constitution and laws.

42 U.S.C. § 1983.

established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To prevail under § 1983, a plaintiff must prove that she: (a) suffered the deprivation of a right secured by the United States Constitution or federal law (b) by a person acting under color of state law. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995).

For present purposes, there is no dispute that Loftus was an individual acting under color of state law at the time of Plaintiff's injury. With respect to the first element of Plaintiff's case – demonstrating a violation of her federal rights, Plaintiff claims that her substantive due process right to bodily integrity was violated by Loftus' conduct under a state-created danger theory. Plaintiff seeks to hold the Iroquois School District liable for this alleged constitutional injury under a municipal liability theory.

Defendants contend that Plaintiff has failed to produce evidence of a substantive due process violation. Alternatively, they contend that Loftus is entitled to qualified immunity. Defendants further contend that the school district cannot be held liable under §1983 because it did not enact any policy, practice or custom which could be identified as the moving force behind the Plaintiff's alleged constitutional injury. We address the Plaintiffs' legal theories first as they relate to Loftus and then as they relate to the School District.

**A**.

Loftus contends that the undisputed evidence precludes any viable substantive due process claim and that, even if such a violation could be established, she is entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from civil liability for civil damages insofar as their conduct does not violate clearly

15

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Normally, the first step in the qualified-immunity analysis is to determine "whether the facts that a plaintiff has alleged ... or shown ... make out a violation of a constitutional right." *Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 816 (2009) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.*

      1. *Has the Plaintiff produced evidence sufficient to establish that her substantive due process rights were violated*?

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV. It is well established that the protections afforded by this clause encompass an individual's liberty interest in his or her own bodily integrity. *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir.2008). Notwithstanding this recognized constitutional liberty interest, however, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), teaches that the Due Process Clause generally does not impose upon the state any affirmative obligation to protect its citizens from private sources of harm.

One exception to this general rule is the "state-created danger" theory. *Phillips*, 515 F.3d at 235. This doctrine holds that state actors can be liable under § 1983 for private harm which befalls a citizen where "state authority is affirmatively employed in a

manner that injures [the] citizen or renders him 'more vulnerable to injury from another source than he ... would have been in the absence of state intervention.'" *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir.2006) (citation omitted). In *Bowers v. De Vito*, 686 F.2d 616, 618 (7th Cir.1982), a case which predates *DeShaney*, the Seventh Circuit Court of Appeals famously summarized the theory behind state-created danger liability by explaining that, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." 686 F.2d at 618.

To establish a claim under the "state-created danger" theory in this circuit, the following elements must be shown to exist:

> (1) the harm ultimately caused to the victim was foreseeable and fairly direct;
>
> (2) the state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright*, 443 F.3d at 281. Failure by a plaintiff to establish any of the foregoing elements will preclude a viable state-created danger claim. *See Smith v. School Dist. of Philadelphia*, Civil Action No. 07–2080, 2009 WL 667455 at *3 (E.D. Pa. Mar. 10, 2009) (*citing Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir.1997)).

17

To avoid entry of a summary judgment in this case, therefore, the Plaintiff must present evidence which shows there is a genuine issue of material fact as to each element of her state-created danger claim.  Defendants contend that Plaintiff has failed to produce evidence sufficient to establish any of the foregoing elements.

(i)     Harm Foreseeable and Fairly Direct

The first element -- that the harm ultimately caused was foreseeable and fairly direct -- necessarily entails allegations of "an awareness on the part of the state actor [ ] that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actor [ ] on notice of the harm."  *Phillips*, 515 F.3d at 238.  *See also D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 625 (M.D. Pa. 2009).  In addition to the foreseeability component of the analysis, we must assess whether the harm "is a 'fairly direct' result of the defendant's acts."  *Phillips*, 515 F.3d at 239.  "This inquiry essentially asks whether the alleged misconduct and the harm caused were "too attenuated" to justifiably hold the defendant liable."  *D.N., supra,* at 625 (*citing Phillips, supra*, at 238).

Boiled to its essence, Defendants' argument is that the harm which befell Plaintiff was not foreseeable in light of the nature of the maneuver she was attempting and the manner in which she fell.[6]  As to the first point, Defendants maintain that the twist-down cradle is not "some death defying stunt" but rather "an intermediate level stunt, which was regularly performed by countless high school cheerleading squads on hard surfaces, without mats, in front of hundreds of parents and other spectators."  (Defs.' Br.

---

[6] Although Defendants have raised these arguments in connection with their challenge to the culpability prong, the arguments logically relate to the foreseeability of harm, so we address them here.

18

in Supp. of Mot. for Summ. Judg. [36] at p. 17.)  Perhaps by way of underscoring this argument, Defendants note that Plaintiff performed the stunt numerous times on the day in question without incident until her last attempt went awry.

Regardless of how the twist-down cradle is formally characterized, however, the fact remains that the stunt involved the Plaintiff being propelled into the air at a considerable height and performing a full rotation of her body, with her safety being dependent upon her being caught properly by her bases and/or spotters.  While the twist down cradle may be commonly performed on hard gym surfaces at basketball games or on football fields, one might reasonably infer that such performances occur only after the stunt has been suitably mastered, thereby presenting less risk to the flyer. Here, however, there is evidence to suggest that the twist down cradle was being introduced to the IHS squad for the first time as a new, more challenging stunt which, it was hoped, could be added to their repertoire in order to potentially score more points in an upcoming national competition.  In fact, one of Plaintiff's squad members acknowledged that many of the other local cheerleading squads were "much more advanced" than the IHS squad and the twist down cradle was "probably like one of our hardest stunts."  (See Pl.'s Ex. 9, Depo. of Melissa Kawski  [51-3] at p. 36; see also Pl.'s Ex. 10, Depo. of Faith Kindig [52-1] at p. 29-30 (distinguishing the squad's other stunts and stating that the "twist-down was kind of, like, a major stunt to learn").)  Plaintiff's point is that, while the twist down cradle was being first introduced and practiced, the potential risk of harm to the flyer was greater and more foreseeable because it was more likely that mishaps might occur.  Moreover, the fact that the Plaintiff was uninjured during her initial attempts to perform the stunt does not compel the conclusion that the

twist-down cradle was easy or without appreciable risk; it may simply mean that the Plaintiff was lucky.

Defendants also contend that the Plaintiff's injury was anything but foreseeable because of the fact that she "came out of the stunt in a manner that all witnesses described as completely unexpected." (Defs.' Br. in Supp. of Mot. for Summ. Judg. [36] at p. 18.) To be sure, the evidence of record includes testimony from numerous eyewitnesses concerning the unusual manner in which the stunt unfolded. Cheerleader Faith Kindig described it as "almost like a freak accident," where the Plaintiff jumped "out of the stunt" and flew outwards some six feet, beyond where her spotters were stationed. (See Pl.s Resp. to Defs.' Concise Statement of Material Facts [43] at ¶ 31.) Ms. James, the McDowell High School cheerleader who demonstrated the twist-down cradle, described the incident similarly, stating that Plaintiff "jumped or dove of the stunt" in a manner that James had never seen before nor has seen since. (Id. at ¶ 32.) Cheerleader Angela Johnson has stated that, during Plaintiff's last attempt at the twist-down cradle, she "lost control" and "[i]nstead of twisting only once, she threw herself forward and twisted twice which made it impossible for anyone to catch her." (Id. at ¶ 33.) Cheerleader Ashley McDonald described Plaintiff "kind of [flying] over [the bases'] heads." (Id. at ¶ 34.) Cheerleader Sarah Graves similarly described the Plaintiff as getting "nervous" and "kick[ing] out." (Id. at ¶ 36.) Fairly read, this evidence can be interpreted to suggest that the Plaintiff came out of the stunt in a manner that was both unusual and unexpected.

Nevertheless, I do not interpret the state-created danger theory as requiring the Plaintiff to prove the foreseeability of harm occurring in precisely the manner in which it

20

ultimately unfolded.  Again, it is significant that the maneuver being practice on the day in question was a new and more challenging stunt for the cheerleading squad, one requiring the Plaintiff to perform an acrobatic movement in mid-air.  Because the twist-down cradle was being practiced from the full-extension rather than the half-extension position, it can reasonably be inferred that Plaintiff was elevated to a height of at least ten feet above the ground while stationary.  After being "popped," Plaintiff would have presumably been propelled to an even greater height,[7] at which point she was expected to perform a full rotation of her body.  The foreseeability of a mishap was amplified by the fact that Plaintiff had been a member of the IHS squad for less than a year and was a relatively inexperienced flyer with virtually no gymnastics experience.

It is also highly relevant that the flooring of the LGI room was a hard surface likely consisting of concrete covered only by industrial carpeting and either little or no padding. The surface was such that Loftus had personally recognized the need for appropriate matting.  At times she had utilize the tri-fold mats which were stored in the boys' locker room but, perceiving these as inadequate, she had approached Vogt on more than one occasion about acquiring better matting.  The record contains evidence that the mother of Amanda Reitz, another flyer on the squad, had similarly expressed concern about the lack of appropriate matting but was told that Vogt had declined Loftus' requests.  (See Defs.' Ex. 3, Depo. of Diane Reitz [75-7] at pp. 14, 26-27.)

Moreover, notwithstanding the unusual nature of Plaintiff's fall, there is evidence to suggest that falls and drops in general were not unknown to the squad.  Both Plaintiff

---

[7] The height at which flyers are commonly elevated is illustrated by a series of photos submitted into the record by Plaintiff in which Amanda Reitz is depicted performing various cheerleading stunts.  (See Pl.'s Ex. 21 ([57-1] and [58-1]).)

and Amanda Reitz had sought medical attention at least once for injuries they incurred as the result of falling or being dropped. Reitz eventually became concerned enough about her own safety and the fact that she was not being properly "based" that she quit the cheerleading squad just days before the incident in question. Reitz further states that she had complained to Loftus on occasion when practices were held in the LGI room without mats. (See Defs.' Ex. 2, Depo. of Amanda Reitz [75-6] at pp. 34-35, 49-54.) As we have previously noted, Faith Kindig also expressed concern, albeit privately, about the fact that the squad would be trying out the new twist down cradle maneuver in a room without matting. (See Pl.'s Ex. 10, Depo. of Faith Kindig [52-1] at pp. 19-22, 29.)

Finally, we note the opinion of Plaintiff's expert, William Brazier, that both the National Federal of High School Associations and the American Association of Cheerleading Coaches and Administrators had issued standards as of March 3, 2004 which would have called for appropriate matting in the circumstances of this case. Mr. Brazier opines that the NFHS spirit rules in particular, while not authoritatively binding on Loftus, had achieved wide acceptance among high school cheerleading programs throughout the country even prior to the date of Plaintiff's injury. Although Defendants insist that the applicable version of the NFHSA and AACCA spirit rules did not require matting for a single twist down cradle, the relevant rules may reasonably be interpreted as requiring matting during the introduction of a new, unmastered stunt, as was the situation here.

Viewing all of these factors in the light most favorable to the Plaintiff, a jury could reasonably conclude that the risk of significant injury from a fall onto the hard LGI flooring surface was foreseeable and a fairly direct result of Loftus' decision to proceed

with the stunt in the absence of appropriate matting.  Thus, even allowing for the fact that Plaintiff came out of the stunt in an unexpected manner, the record as a whole does not preclude a reasonable finding of a sufficiently concrete risk of harm as would satisfy the foreseeability element.

(ii)    Deliberate Indifference

With respect to the second element of the "state-created danger analysis," *to wit*, the requirement that the state actor must have acted with a degree of culpability that "shocks the conscience," we note that the "exact degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the circumstances of a particular case.'"  *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.1999).  Where a state actor has the time to deliberate about his actions and is not under pressure to make hurried judgments, the state actor's conduct will be sufficiently "conscience shocking" if it displays a deliberate indifference toward a substantial risk of serious harm to the plaintiff.  *See Navolio v. Lawrence County*, 406 Fed. Appx. 619, 624 (3d Cir.2011) ("In a case where state actors have the time to make unhurried judgments, the level of culpability required to shock the conscience is deliberate indifference.") (*quoting Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir.2006)).

Defendants do not challenge the applicability of the "deliberate indifference" standard for purposes of this case; rather they insist that this standard cannot be met on the basis of the facts presented.  As we have noted, Defendants maintain that the twist-down cradle was merely an intermediate-level maneuver routinely performed at high school games without matting, and they construe Plaintiff's fall as essentially a "freak accident."  Because these arguments relate more to the foreseeability of the risk of

23

harm, I have previously addressed them in that context. For the reasons already enumerated, I have concluded that a jury could reasonably find, notwithstanding the unusual nature of Plaintiff's fall, that the stunt in question presented a sufficiently concrete risk of harm as to put Loftus on notice that serious injury might befall Plaintiff in the event that the stunt went awry over the hard flooring surface of the LGI room. My analysis in that regard nevertheless bears on the second element of Plaintiff's state-created danger claim because, as a logical matter, an actor's conduct in the face of a foreseeable risk of harm necessarily informs on the issue of the actor's *mens rea*.

Here, Defendants contend that no finding of deliberate indifference is possible because Loftus took several precautionary steps in connection with introducing the twist-down cradle to her squad. Pertinently, there is no dispute about the fact that Loftus delayed introducing the twist-down cradle for some seven months while her squad progressed in their skill level. In addition, Loftus invited an experienced cheerleader to demonstrate the stunt on the day in question, and Loftus utilized numerous spotters during Plaintiff's attempts to perform the maneuver. According to the Defendants, these measures conclusively show that Loftus was, at most, negligent in allowing the stunt to proceed in the unmatted LGI room (and, in fact, Defendants do not concede even negligence on the part of Loftus).

Defendants also quote (in their renewed motion for summary judgment) various excerpts from the AACCA manual relied upon by Mr. Brazier which, collectively, they read as significantly downplaying the degree of protection afforded by various mats in terms of preventing catastrophic injury. All of these factors, Defendants insist, preclude a finding of deliberate indifference on the part of Loftus.

24

I disagree, however, because, in my view, the question as to whether Loftus' actions amounted to mere negligence or conscience-shocking deliberate indifference to a foreseeable risk of harm is an issue of fact which must ultimately be resolved by a jury. Although factual issues may be decided by the court under Rule 56 when the evidence is so one-sided as to permit only one reasonable conclusion, that is not the situation here.

As I have previously discussed, there is evidence in this case to suggest that the twist down cradle was a significantly challenging maneuver for the IHS cheerleaders based on the squad's relative level of skill and Plaintiff's fairly limited experience as a flyer. There is also evidence to suggest that drops or falls were not unprecedented events for the flyers of the IHS cheerleading squad. In fact, both Amanda Reitz and her mother had complained to Loftus about the lack of adequate matting in light of the type of stunts that were being performed during cheerleading practice. In addition, Faith Kindig has stated that certain members of the squad privately expressed some trepidation about the fact that they would be practicing the twist-down cradle for the first time without the benefit of mats. Most significantly, there is evidence that Loftus herself fully appreciated the need for better matting to the point that she approached the Athletic Director about the issue, unsuccessfully, and informed other parents of this fact. Despite this awareness, Loftus allowed the introduction of the twist-down cradle to proceed in the unmatted LGI room. According to Mr. Brazier, Loftus' actions in this

regard were in contravention of the applicable standards published by both the NFHS and the AACCA.[8]

Further, notwithstanding the language of the AACCA manual cited by Defendants, the manual cannot be fairly read as suggesting that stunts can or should proceed in the absence of any matting at all. Rather, the excerpts cited by the Defendants merely suggest that mats are an important component of safety but not a fail-safe method of preventing catastrophic injuries. (See generally Brazier Depo. Ex. A [75-2] at pp. 33-34.) Notably, the manual also stresses the importance of "performer readiness, [consideration of] the difficulty level of the skills, appropriate use of progressions, competent instruction and supervision, and proper spotting" as "essential prerequisites to creating a reasonably safe environment" for cheerleaders. (Id. at 32.) The manual further emphasizes the importance of avoiding off-balance landings, which can result in catastrophic head, neck or back injury. (See id. at p. 34 ("[R]egardless of the type or thickness of the mats used, any landing on the head, neck or in an off-balance position could result in serious, catastrophic injury, or even death and must be avoided at all costs.") On this record, it would not be unreasonable for a jury to infer that Loftus disregarded some or all of these basic safety considerations.

Finally, Defendants ask us to consider the fact that the tri-fold mats that were made available to the IHS cheerleading squad were considered dangerous by Loftus

_____

[8] Defendants vigorously dispute certain aspects of Mr. Brazier's opinion, including his opinions as to whether the NFHS and/or AACCA established any clear guidelines for purposes of this case and whether those guidelines carried any authoritative weight. Having considered the parties' respective arguments relative to Mr. Brazier's expert report and the underlying NFHS and AACCA publications, I conclude that these issues are best left to the jury, which can decide how much weight, if any, to give Mr. Brazier's opinion. Of course, for purposes of the pending motion, I must interpret Mr. Brazier's conclusions in the light most favorable to the Plaintiff.

due to the fact that they tended to slide, and Loftus' request for better matting was denied.  To the extent these facts are meant to suggest that Loftus could not have been deliberately indifferent because she lacked other viable alternatives, this Court is not persuaded that the issue of deliberate indifference should be removed from a jury's consideration.  Based on the record before me, a jury could reasonably conclude that other options existed for Loftus, the most obvious option being  postponing the stunt until appropriate matting could be obtained or, if necessary, abandoning it altogether.  Ultimately, therefore, the question as to whether Loftus' decision to proceed with the twist down cradle under all of the foregoing circumstances amounts to deliberate indifference on the part of Loftus or some lesser standard of *mens rea* is not an issue that this Court can decide as a matter of law.[9]

---

[9]  In arguing that the record here could only support, at most, a finding of negligence on the part of Loftus, Defendants refer us to *Pope v. Trotwood-Madison City School Dist. Bd. Of Educ.*, 162 F. Supp. 2d 803 (S.D. Ohio. 2000) and *Yatsko v. Berezwick*, No. 3:06cv2480, 2008 WL 2444503 (M.D. Pa. June 13, 2008).  Broadly speaking, these cases stand for the well-recognized proposition that mere negligence on the part of a state actor will not constitute "conscience-shocking behavior" supportive of a substantive due process violation.  Having reviewed these cases, I do not find their facts to be sufficiently analogous to our own so as to compel the conclusion, as a matter of law, that Loftus' conduct amounted to nothing more than negligence.

In addition, I am unpersuaded by the reasoning of the cited cases.  In determining that the defendant's conduct did not "shock the conscience" so as to violate the decedent's substantive due process rights, the district court in *Pope* applied the rule that only "arbitrary, deliberate misconduct… that was designed to punish or otherwise harm the decedent" would suffice to establish "conscience-shocking" behavior.  *See* 162 F. Supp. 2d at 810.  The court was not applying this rule in the context of a state-created danger theory and, in any event, the stated rule does not represent the law of this circuit insofar as the facts at bar are concerned.  *See Sanford v. Stiles*, 456 F.3d 298, 309 (2006) at 309 (deliberate indifference may satisfy the requirement of conscience-shocking behavior for purposes of a substantive due process claim where there is opportunity for the defendant to deliberate).

Moreover, to the extent that the *Pope* court *did* consider a state-created danger paradigm, the court found it inapplicable because of the fact that the decedent in *Pope* had not been placed "in a dangerous environment where he suffered harm due to acts of violence committed by a private third party."  See 162 F. Supp. 2d at 812.  The *Pope* court thus construed the state-created danger theory as having no application in cases where "harm is inflicted by a defendant state actor rather than by a third party."  *Id*. at 811.  To the extent the *Pope* court was imposing a *per se* requirement that the plaintiff's harm result from the acts of a third party, I do not consider such a requirement to be consistent with Third Circuit law.  *See, e.g., Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) (applying state created danger

(iii)     Plaintiff a Foreseeable Victim

The third element of state-created danger requires that the plaintiff show "a relationship between the state and the plaintiff" such that the plaintiff was "a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Bright*, 443 F.3d at 281.  This requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Kneipp v. Tedder*, 95 F.3d 1199, 1209 n. 22 (3d Cir.1996).

This element is easily satisfied on the present record.  As a member of Loftus's cheerleading squad who was attempting to learn a new stunt under Loftus's direct supervision, Plaintiff was certainly within the realm of individuals foreseeably affected by Loftus's actions.  In fact, as the squad's (relatively inexperienced) flyer, Plaintiff was seemingly more likely than anyone else on the squad to suffer from a stunting mishap.  Accordingly, Plaintiff has produced sufficient evidence to establish the third element of her state-created danger case.

(iv)     Affirmative Use of State Authority

The fourth prong of the state-created danger theory requires the plaintiff to show that the relevant state actor affirmatively used her authority in a way that created a

---

theory to find cognizable substantive due process claim where injury to intoxicated pedestrian involved falling down an embankment and subsequently suffering brain damage).

I am similarly unpersuaded by the reasoning of the court in *Yatsko.*  In that case, the court appears to have applied a legal standard that would require more than "deliberate indifference" in order to establish conscience-shocking behavior, even in a factual context where there was seemingly time for deliberation.  *See* 2008 WL 2444503 at *6 n.1 (finding the case of *Sciotto ex. rel. Sciotto v. Newton School Dist.*, 81 F. Supp. 2d 559 (E.D. Pa. 1999) inapposite because the *Sciotto* court applied the "less exacting standard" of deliberate indifference).  To the extent *Yatsko* can be interpreted as involving circumstances that did not allow for deliberative decision-making on the part of the state actors, the case is materially distinguishable from the case at bar.

28

danger to the plaintiff or that rendered the plaintiff more vulnerable to danger than had the state not acted at all. *Walter v. Pike County, Pa.,* 544 F.3d 182, 192 *(quoting Bright,* 443 F.3d at 281). To satisfy this fourth element, our court of appeals requires a plaintiff to (1) show that a state official affirmatively acted to the plaintiff's detriment and (2) establish direct causation between the affirmative act and the result. See *Estate of Soberal v. City of Jersey City,* 334 Fed. Appx. 492, 495 (3d Cir. 2009) (*citing Phillips v. County of Allegheny*, 515 F.3d 224, 236-37 (3d Cir.2008); *Kaucher v. County of Bucks*, 455 F.3d 418, 432 (3d Cir.2006)).

Here, the Plaintiff's injury occurred during the course of a cheerleading practice organized and supervised by Loftus and while attempting a new and more challenging stunt as yet unmastered by the IHS squad. The evidence of record allows a reasonable inference that the squad would not have been practicing the twist-down cradle during the course of their practice session, but for Loftus's express authorization and direction. Thus, a jury in this case could rationally find that Loftus used her authority as a coach to introduce a new, more challenging cheerleading stunt – a stunt which required Plaintiff to be air-born at a significant height and potentially subject to an off-balance landing onto a hard surface without the benefit of sufficient matting. A jury could further conclude that this affirmative conduct on the part of Loftus rendered Plaintiff more vulnerable to a foreseeable danger than Plaintiff would have otherwise been in the absence of such affirmative conduct.[10] Because Plaintiff has presented evidence

---

[10] In this regard, I find the case of *Leonard v. Owen*, Civil Action No. 08-2016, 2009 WL 603160 (E.D. Pa. Mar. 5, 2009), cited by Defendants, to be distinguishable. In *Leonard,* the plaintiff was a high school track and field athlete who was seriously injured during an after-school training session when a fellow student-athlete threw a javelin which impaled her. The plaintiff later filed suit claiming, in relevant part, that her coaches violated her substantive due process rights under a state-created danger theory by failing to

sufficient to satisfy each element of her state-created danger claim, Defendants' motion for summary judgment will be denied insofar as it is premised on an alleged failure by Plaintiff to produce evidence of a substantive due process violation.

2. *Was the right in question clearly established as of March 3, 2004?*

Having thus concluded that the evidence, if construed most favorably to Plaintiff, could support a finding that her substantive due process rights were violated, we next consider whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808, 816 (2009). "A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right." *Eddy v. Virgin Islands Water and Power Auth.,* 256 F.3d 204, 208 (3d Cir. 2001) (*quoting Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir.2000)). This determination is to be made based upon the legal landscape which existed at the time of the challenged conduct. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("in the light of pre-existing law the unlawfulness must be apparent"). A right may be clearly established, however, even if there is no "previous precedent directly in point." *Eddy,* 256 F.3d at 208 (quoting *Good v. Dauphin County Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir.1989)). Courts have defined the term "clearly established" to mean "some but not precise factual

---

properly monitor potentially unsafe athletic activities. The district court dismissed this claim on the grounds that the fourth element of state-created danger could not be satisfied. Notably, the court found that the risk of harm to the plaintiff was foreseeable and that the defendants' actions could satisfy the standard of "willful disregard for" or "deliberate indifference to" the plaintiff's safety. Id. at *6-7. However, the court found that the plaintiff had failed to allege affirmative conduct on the part of the coaches which had the effect of making the plaintiff more vulnerable to the risk of harm than she otherwise would have been without their intervention. Id. at *7 (noting "it was Bissland's decision to throw the javelin that placed Plaintiff in harm's way"). Unlike *Leonard*, this case involves facts from which the requisite danger-inducing affirmative conduct on the part of Loftus can be established.

correspondence between relevant precedents and the conduct at issue." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir.2001). Applying these standards, we find that the right in question was sufficiently clearly established as of March 3, 2004 such that Loftus can be held liable, should a jury find that a constitutional violation occurred.

Defendants do not appear to contest the fact that, as of March 2004, a student's constitutionally protected liberty interest in his or her own bodily integrity had been well established. *See generally Ingraham v. Wright,* 430 U.S. 651, 673–74 (1977) (freedom from restraint and appreciable physical pain inflicted by school officials is within the scope of a student's protected liberty interests); *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 726-27 (3d Cir. 1989) (substantive due process claim involving student's sexual molestation at the hands of a teacher); *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1368-69 (3d Cir. 1992) (en banc) (student subject to sexual molestation perpetrated by fellow students); *Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir.1988) (substantive due process claim involving excessive physical discipline of a student).

Moreover, the law was clear as of 2004 that government conduct which violated a protected liberty interest would amount to a substantive due process violation if it arose to a level that "shocked the conscience." *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (noting that "[o]ur cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" and further stating that "for half a century now we have spoken of a cognizable level of executive abuse of power as that which shocks the conscience.").

In its 1998 ruling in *County of Sacramento v. Lewis,* the Supreme Court clarified that, whether executive action is "conscience shocking," and therefore constitutionally impermissible, will depend on the context of the case -- particularly, the urgency with which officials must act and the degree to which they must weigh competing, legitimate state interests.  The specific question before the Court in *Lewis* was "whether a police officer violated the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender."  523 U.S. at 836.  In addressing this question, the Court discussed the varying extremes of the "culpability spectrum," noting that, on one hand, negligently inflicted harm is "categorically beneath the threshold of constitutional due process" and, at the other end of the spectrum, "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 848-49 (citations omitted).  The "closer calls," the Court acknowledged, would occur in cases were "injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or 'gross negligence'…"  *Id.* at 849.

In exploring this concept, the Court reaffirmed the principle that deliberate indifference may satisfy the "conscience-shocking" standard, but the Court cautioned that this type of determination would involve a context-specific inquiry because "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another."  *Id.* at 850.  "As the very term 'deliberate indifference' implies," the Court noted, "the standard is sensibly employed only when actual deliberation is

practical." *Id.* at 851. The due process liability that courts had imposed upon prison officials who are deliberately indifferent to a pretrial detainee's serious medical needs, for example, "rest[ed] upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853.

Although the defendant in Lewis had been accused of, among other things, "recklessness, gross negligence and conscious disregard for [the decedent's] safety," *id.,* at 854, the Court held that a much higher level of culpability than that would be required in order to establish a substantive due process violation in light of facts presented. *See id.* at 854 (concluding that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment"). Pertinently for our purposes, however, *Lewis* reaffirmed the general principle that substantive due process violations require conscience-shocking behavior, which may encompass conduct evidencing a deliberate indifference to the safety and well-being of others in circumstances where deliberation and forethought are practical.

As of 2004, it was also clearly established in this circuit that a state actor could, under appropriate circumstances, be held liable for substantive due process violations under a state-created danger theory. The Third Circuit Court of Appeals formally adopted this theory in 1996 when it decided *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). In that case, a Philadelphia police officer (and others) were sued after detaining a man and his wife for an alleged disturbance and leaving the visibly intoxicated wife to walk home alone at night while the man went on ahead to relieve their babysitter; the

33

wife later fell down an embankment and, due to hypothermia brought on by the cold, suffered serious brain damage.  The Third Circuit found that the plaintiffs stated a viable substantive due process claim under a state-created danger theory by presenting evidence sufficient to establish the following elements:  (1) "the harm likely to befall [the wife] if separated from [her husband] while in a highly intoxicated state in cold weather was indeed foreseeable," 95 F.3d at 1208; (2) the defendant police officer acted in willful disregard for the wife's safety, *id.* at 1208-09; (3) a relationship existed between the police officer and the wife during which the officer exerted control over the wife and placed her in danger of a foreseeable injury, *see id.* at 1209; and (4) the defendant officer used his authority as a state actor to create a dangerous situation or to make the wife more vulnerable to danger than she would have been had police not intervened. *See id.*

Of course, *Kneipp* was decided prior to *Lewis*.  In *Pahler v. City of Wilkes-Barre*, 31 Fed. Appx. 69 (3d Cir. 2002), however, the Third Circuit Court of Appeals considered a state-created danger claim in light of the principles set forth in *Lewis*.  The claim in *Pahler* involved allegations by the plaintiff police officer that his substantive due process rights had been violated by his forced participation in a high risk drug raid with other officers whom the plaintiff contended had been inadequately trained, and which had resulted in the plaintiff being accidentally shot by another officer.  Citing *Kneipp*, the *Pahler* court revisited the four-pronged test applicable in state-created danger cases, namely:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state

> actors used their authority to create an opportunity that otherwise would
> not have existed for the third party's crime to occur.

31 Fed. Appx. at 71. Citing to its decision in *Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir. 1999) – a non-state-created danger case, the court of appeals recalled its holding that "*Lewis* requires a court, in all substantive due process cases, to determine if the state actor's behavior shocks the conscience" and, further, "[t]he precise degree of wrongfulness to reach the "conscience-shocking" level depends upon the circumstances of a particular case." 31 Fed. Appx. at 71. The *Pahler* court then went on to apply the state-created danger framework to the facts before it, with the somewhat nuanced proviso that, pursuant to *Lewis,* "a plaintiff seeking to recover under a 'state-created danger' theory must show that the actor acted with a willful disregard for or deliberate indifference to plaintiff's safety that rises to the level of shocking the conscience." *Id.* Because the *Pahler* Court found the plaintiff's allegations insufficient to satisfy this standard of culpability, it affirmed the district court's dismissal of the claim. *Id.* at 72.

By March 3, 2004, the law of state-created danger had firmly taken hold in the Third Circuit and had been successfully pled more than once in the context of alleged substantive due process violations committed against children in the school setting. In *Maxwell v. School District of the City of Philadelphia*, 53 F. Supp. 2d 787 (E.D. Pa. 1999),[11] the U.S. District Court for the Eastern District of Pennsylvania considered a substantive due process claim brought by a special education student who alleged that

---

[11] Our circuit court of appeals has not precluded consideration of district court rulings in deciding whether a constitutional right is "clearly established" for qualified immunity purposes. *See Doe v. Delie*, 257 F.3d 309, 321 (3d Cir. 2001) ("District court opinions may be relevant to the determination of when a right was clearly established for qualified immunity analysis.")

she had been raped by fellow students in the presence of a substitute teacher who had been presiding over the classroom but failed to intervene.

Applying the factors developed in *Kneipp* and *Morse v. Lower Merion School District,* 132 F.3d 902 (3d Cir. 1997), the district court in *Maxwell* found that the plaintiff stated a viable claim under a state-created danger theory. In particular, the court found that the rape of the plaintiff was foreseeable and a fairly direct result of the state's actions because the teacher had been aware of the perpetrators' attempts to sexually assault a different student earlier in the same day, and she had witnessed the perpetrators' actions in hauling the plaintiff to the back of a room behind a portable blackboard. With regard to the culpability prong, the court found that the complaint sufficiently pled "willful disregard for or deliberate indifference to the plaintiff's safety." 53 F. Supp. 2d at 793 (*quoting Morse*, 132 F.3d at 910). This conclusion was based on allegations that the teacher had told a classroom full of disruptive students: "I don't care what you do as long as you do not bother me," and that she had done nothing following the attempted assault on the first student and had passively witnessed the subsequent assault on the plaintiff. *Id.* As for the third state-created danger element, the court found the relationship between the teacher and the plaintiff adequate to establish the plaintiff as a foreseeable victim, particularly since the teacher knew that the plaintiff was the object of an attack. Finally, the court found the allegations sufficient to show that the state had created the opportunity for the harm which befell the plaintiff, inasmuch as the state defendants had isolated the victims with their attackers by locking the classroom doors, and the plaintiff's teacher had essentially informed her unruly class that she would not attempt to control them. *Id.*

In *Susavage v. Bucks County Schools Intermediate Unit No. 22*, No. CIV A. 00-6217, 2002 WL 109615 (E.D. Pa. Jan. 22, 2002), the plaintiffs were the parents of a school-aged child who suffered from a musculo-skeletal condition which rendered her unable to sit upright independently and who died while traveling to school on the school bus after she was improperly harnessed in her seat. The plaintiffs asserted, among other things, a substantive due process claim against the Bucks County Schools Intermediate Unit No. 22 ("BCIU"), an entity created by the Commonwealth of Pennsylvania to provide services to the decedent's school district. The complaint alleged that BCIU had at various times received notice that the decedent could not travel unattended to and from school, that she required a personal assistant during transportation for safety reasons, and that she required special equipment to maintain postural alignment for safe transportation. Upon the recommendation of the child's school that a special car seat would be required for the child, the plaintiffs had pleaded with the defendants to provide the special car seat or, alternatively, to provide one-on-one supervision of their child during bus transportation until the car seat could be obtained. Eventually, it was agreed that a special harness owned by BCIU would be utilized. The harness lacked a five-point restraint system such that the part of the harness meant to go across the child's chest could come into contact with the child's chin or throat if the child slipped downward in her seat. Additionally, on the date of the decedent's death, the harness was not applied properly.

In considering the plaintiff's state-created danger claim against BCIU, the district court applied the four-part test adopted in *Kneipp* and found the claim viable:

37

Based on the facts pled in this case … a jury could find that the risk of the kind of serious harm to Cynthia that actually occurred was known to exist, given her condition and the special warnings given to BCIU about the delicacy of any bus transportation attempted. Moreover, a jury could find that the injury was the *direct* result of the type of harness utilized, the way in which it was applied, or the choice that she be transported unattended. The fact that BCIU accepted responsibility for transporting the child satisfied the third *Kneipp* relationship prong. Because BCIU was aware of Cynthia's medical condition which prevented her from sitting upright or riding unattended, failure to insure a safe transport system for Cynthia prior to subjecting her to the risk of foreseeable serious injury could be viewed as a "failure to act appropriately in light of known or obvious risk," that is, deliberate indifference.

Finally, a jury could find that through the act of placing Cynthia in a harness for which she had not been adequately evaluated and then leaving her unsupervised during the bus transport, BCIU created an opportunity that would not otherwise have existed for the child to suffer strangulation.

2002 WL 109615 at *15 (emphasis in the original).

More factually analogous is the case of *Sciotto v. Marple Newtown School District*, 81 F. Supp. 2d 559 (E.D. Pa. 1999). In Sciotto, a high-school student was rendered quadriplegic after "live wrestling" a 22 year-old college student, some thirty-five pounds heavier than himself, during a sanctioned wrestling practice. The college student had been invited by the coaches to wrestle with the various high-school team members pursuant to a long-standing tradition whereby alumni would return to participate in wrestling practices following their graduations. The district court held that the plaintiffs' state-created danger claim would survive the defendants' summary judgment challenge.

The court first found that the invitation of older, heavier and more experienced alumni wrestlers to engage in "live wrestling" created a foreseeable, fairly direct risk of harm to students on the team. Supporting the foreseeability element were numerous

38

factors, including the opinion of a wrestling expert that the practice of allowing older, heavier, and more experienced alumni to "live wrestle" highschoolers was "an accident waiting to happen." 81 F. Supp. 2d at 564. In addition, one of the coaches had been aware of a prior injury suffered by a team member while "live wrestling" an alumnus, there had been prior complaints by parents concerning the practice, and a PIAA By-Law forbade alumni and college athletes from participating in contests with, or scrimmaging with high school athletes, including wrestling. In addition, the court found that the injury suffered was a "fairly direct" result of the coaches' conduct in inviting alumni to participate in wrestling practice and in condoning the practice of live wrestling.

The *Sciotto* court next found that the record would support a finding of willful disregard for the student's safety. In explaining this element, the court stated that "(t)he environment created by the state actors must be dangerous; they must know it to be dangerous; and …must have been at least deliberately indifferent." 81 F. Supp. 2d at 565 (ellipsis in the original) (*quoting Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)). The court found that the evidence would permit a finding that the tradition of inviting alumni wrestlers to live wrestle with the high school wrestlers created a dangerous environment, the coaches were aware of this danger, and they were nevertheless deliberately indifferent to it. Id. at 566.

For purposes of the third state-created danger element, the *Sciotto* court found that the injured plaintiff, as a member of the team, was a member of a class of individuals made vulnerable to injury as a result of the policy condoned by the coaches. Id. Finally, the court found that the state actors had used their authority to create an

opportunity for harm that would not have otherwise existed by creating, maintaining, and condoning the practice of inviting back alumni wrestlers to the high school practices.

The court having found sufficient evidence of a substantive due process violation to withstand summary judgment, the *Sciotto* court went on to evaluate whether the plaintiffs' constitutional rights were clearly established for purposes of overcoming the defendants' assertion of qualified immunity. Though the court found that the student's right to bodily integrity under the Fourteenth Amendment was well established, the court found that right "too abstract" for purposes of assessing qualified immunity. 81 F. Supp. 2d 568. It therefore undertook a more particularized articulation of the right involved, which it identified as "a student's right to freedom from school officials' deliberate indifference to, or affirmative acts that increase the danger of, serious injury from unjustified invasions of bodily integrity perpetrated by third parties in a school setting." Id. After undertaking a lengthy review of the cases both within and without the Third Circuit,[12] the *Sciotto* court found that this right was clearly established as of January 10, 1997, the date of the student's injury:

---

[12] *See generally* 81 F. Supp. 2d at 570-71 (discussing, *e.g., Ingraham v. Wright,* 430 U.S. 651 (1977) (Due Process Clause protects "a right to be free from unjustified intrusions on personal security" in the form of corporal punishment by teachers); *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 730 (3d Cir. 1989) (as of 1981 it was clearly established law that a supervisory school official's deliberate indifference -- in the form of affirmative acts, condonation, or encouragement – to sexual assaults upon public school children by subordinates would subject the supervisory official to liability for a due process violation); *D.R. v. Middle Bucks Area Voc. Tech. Sch.* 972 F.2d 1364 (3d Cir. 1992) (no liability under state-created danger theory for sexual assaults upon students perpetrated by other students in the absence of evidence showing that school officials somehow acted affirmatively to create the danger or increase the risk of harm to the victim); *Hunter v. Carbondale Area School Dist.*, 829 F. Supp. 714 (M.D. Pa.), *aff'd* 5 F.3d 1489 (1993) (no state-created danger liability in the case where students placed in detention with a special education student chased the special education student off school property into a stream where he drowned; no evidence existed to show that school officials encouraged, facilitated, or authorized the students to engage in the conduct that took place); *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994) (no liability on the part of school officials where student was killed by stray bullet fired by a non-student in a school hallway; suggesting that liability would exist under a state-created danger theory where there was awareness of and deliberate indifference to a danger among school

[S]ince *Ingraham* was decided two decades ago, it has been clearly established that a student's right to bodily integrity must be respected in the school setting. *Stoneking* stated that a substantive due process violation will be found where a school official affirmatively acts, or encourages or condones (i.e., is deliberately indifferent to), behavior by subordinates that leads to an invasion of bodily integrity. Furthermore, since *D.R., Hunter*, and *Kneipp*, it has been clear in this circuit that school officials may be held liable for a constitutional violation where they affirmatively act to place a student in danger of harm by a third party non-state actor. *Johnson, Leffall, and Graham* in other circuits lent additional clarity.

Individually and taken as a whole, these cases clearly were sufficient to "give fair warning" to school officials that when they affirmatively acted to place a student in danger of physical harm at the hands of third parties, or were deliberately indifferent to such danger, a constitutional violation would be found. *See United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). While it would appear that no case prior to Louis Sciotto's injury had held school officials constitutionally liable for student injuries perpetrated by third parties, the cases cited above clearly set forth the circumstances under which liability would be found.

Defendants appear to argue that because no constitutional right has been found under identical facts, it is impossible to find that the right asserted by Louis Sciotto was clearly established. However, neither the Court of Appeals for the Third Circuit nor the Supreme Court requires "strict factual identity" to the present case, and this Court need only find "some factual correspondence" to identify a clearly established right. *See Stoneking*, 882 F.2d at 726. The facts in *D.R.* and *Hunter* offer factual correspondence – violence against students by third parties under the supervision of school officials – and though the courts in those cases did not find violation of a constitutional right, they made clear the circumstances under which a violation would be found. I conclude that the facts in this case – in particular, the affirmative acts and conscious decisions by school officials to permit and encourage the wrestling practices involved here – fall within the circumstances envisioned by those cases to constitute a civil rights violation.

81 F. Supp. 2d at 571-72. The court concluded that, based on the information allegedly known to the defendant coaches, reasonable school officials in their position would have believed that the plaintiff's constitutional right "to be free from school officials' deliberate indifference to, or affirmative acts that increased the danger of serious injury from unjustified invasions of bodily integrity perpetrated by third parties" was threatened

---

officials, affirmative conduct by school officials, or where a state actor placed a student in a "unique confrontational encounter" with a violent individual); *Leffall v. Dallas Ind. Sch. Dist.*, 28 F.3d 521, 531 (5th Cir. 1994) (suggesting that, where "the state knowingly brought the victim into close proximity with a specific individual known to be likely to commit violence," the state-created danger theory would apply); *Graham v. Ind. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994) (suggesting that evidence of affirmative actions by school officials may create liability under a state-created danger theory)).

by the custom of inviting and allowing older, heavier, more experienced alumni wrestlers to live wrestle the students at practice.   *Id.* at 573.

I similarly conclude, based on the analysis set forth in *Sciotto* as well as the other authorities discussed herein, that a reasonable school official in Loftus' position would have understood, as of March 3, 2004, that she could be subject to liability under a state-created danger theory for affirmative conduct on her part that created or increased a foreseeable risk of serious harm to cheerleaders under her supervision and that evidenced a deliberate indifference on her part to that foreseeable risk of harm. Because the constitutional right at issue here was clearly established as of March 3, 2004, Loftus' assertion of qualified immunity must be denied.

Defendants have asserted a number of arguments as to why the law was not sufficiently developed on this point, but I find them to be unpersuasive.  First, citing *Noffke v. Bakke*, 760 N.W. 2d 156 (Wis. 2009), Defendants argue that no meaningful standards existed in 2004 concerning the use of mats or other safety measures in cheerleading.  The portion of *Noffke* cited by Defendants dealt with the issue of whether a school district could be liable under state law for an injury inflicted upon the squad's flyer through the alleged negligence of the coach.  Since Wisconsin law statutorily entitled the school district to immunity for discretionary acts of the coach, the *Noffke* court considered whether the NFHS spirit rules – including those pertaining to matting -- gave rise to a ministerial duty on the part of cheerleading coaches and found that they did not.  See 760 N.W. 2d at 379 ("We do not interpret these provisions to prescribe and define the time, mode, and occasion for matting with such certainty that nothing remains for judgment or discretion.").

*Noffk's* analysis does not compel a finding of immunity in this case, however, because the standards applied under federal law for qualified immunity relative to due process violations are materially different from the standards applied in *Noffke* and, moreover, the record here is materially distinguishable. Here, Plaintiff has proffered expert testimony from which a jury could conclude that the relevant provisions of the spirit rules were *not* discretionary insofar as they address the need for matting under the circumstances of this case. More fundamentally, whether or not an authoritative rule exists relative to the complained of conduct is not, in my view, a dispositive factor for purposes of state-created danger and qualified immunity analyses. Even if it can be said that applicable spirit rules accord coaches some degree of discretion on the issue of matting, it would not necessarily follow as a matter of law that Loftus could not have been deliberately indifferent to a foreseeable risk of serious harm by virtue of introducing a more challenging stunt without the use of mats under the circumstances presented here. Stated differently, if Defendants are suggesting that qualified immunity can be overcome only by the existence of a non-discretionary spirit rule specifically addressing the need for matting in the case of a newly introduced single-twist-down cradle, then Defendants are demanding more precision than the law of this circuit requires.

Defendants next contend that the governing standard of culpability in state-created danger cases was unclear in 2004, and remains so today. In support of this proposition, Defendants refer us to *Sanford v. Stiles,* 456 F.3d 298, 305 (3d Cir. 2006) ("The Supreme Court has not fully explicated the standard of culpability in substantive due process cases generally, and our own jurisprudence is difficult to discern."); *Estate*

*of John Olivia v. State of New Jersey*, 579 F. Supp. 2d 643, 683 (D.N.J. 2008) ("[T]he standard as to the appropriate level of culpability required of a state actor under a state-created danger theory has only been more fully developed in recent years."); and *Estate of Smith v. Marasco (Smith II)*, 430 F.3d 140, 145 (3d Cir. 2005) ("The jurisprudence does not yield a clear definition of 'conscience-shocking'…").

However, the confusion to which these cases refer concerns an area of substantive due process jurisprudence not implicated by the facts of this case. As the extended discussion in *Sanford* makes clear, the "difficult area of the law" which arose in this circuit post-*Lewis* and which the *Sanford* court was attempting to elucidate, 456 F.3d at 305, concerned the appropriate culpability standard for substantive due process claims involving (what I will term) "mid-level" cases -- i.e., situations where a state actor, on the one hand, is not confronted with a "hyperpressurized environment" akin to a high speed car chase (pursuant to *Lewis,* an intent to cause harm would normally have to be shown in those cases) but, on the other hand, also does not have the luxury of proceeding in a deliberate fashion (in those cases deliberate indifference would be the standard). See *Sanford*, 456 F.3d at 306 (noting that, following *Lewis,* '[t]he exact degree of wrongfulness necessary to reach the conscience-shocking level depends upon the circumstances of a particular case,'" and beginning its discussion of the confusion which arose post-*Lewis* with *Miller v. City of Philadelphia*, 174 F.3d 368 (3d Cir. 1999), wherein the court "first utilized a standard part way between intent to harm and deliberate indifference"). 456 F.3d at 306. A secondary area of confusion concerned whether this heightened standard of culpability would apply in state-created danger cases – a point which we discuss further below.

44

*Sanford*'s discussion of this point of confusion includes a lengthy review of numerous decisions by the Third Circuit Court of Appeals – involving both state-created danger cases and non-state-created danger cases – which were rendered in an attempt to flesh out an appropriate standard of culpability relative to mid-level cases. *See generally Sanford,* 456 F.3d at 305-10 (discussing *Miller v. City of Philadelphia*, 174 F.3d 368, 375-76 (3d Cir. 1999) (applying a new standard of fault, described as "gross negligence or arbitrariness that indeed 'shocks the conscience,'" to be applied in cases where no immediate or split-second decision was required, but where officials nonetheless lacked the luxury of true deliberation); *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002) (refining the *Miller* standard for circumstances where no instantaneous decision is necessary but where the state actor also does not have the luxury of proceeding in a deliberate fashion; requiring a plaintiff in those circumstances to show that the defendant "consciously disregarded, not just a substantial risk, but a great risk that serious harm would result."); *Estate of Smith v. Marasco ("Smith I"),* 318 F.3d 497, 509 (3d Cir. 2003) (holding that, for cases falling in the grey area between "true split-second decisions" and "relaxed deliberation," liability would be found if the official's conduct "exhibits a level of gross negligence or arbitrariness that shocks the conscience"); *Rivas v. City of Passaic,* 365 F.3d 181, 196 (3d Cir. 2004) (explicitly acknowledging applicability of *Ziccardi*'s heightened standard for culpability in a state-created danger case but then referencing the appropriate standard at one point as conscious disregard of a "substantial risk" of harm, which is associated with deliberate indifference); *Estate of Smith v. Marasco (Smith II),* 430 F.3d at 153-56 (3d Cir. 2005) (seemingly applying the *Ziccardi* standard of culpability as a "useful" approach, but

45

noting that *Ziccardi* did not address whether its standard would apply in state-created danger claims)).

Ultimately, in attempting to clarify the law relative to mid-level cases involving claims of state-created danger, the *Sanford* court adopted the *Ziccardi* standard, holding that:

> in a state-created danger case, when a state actor is not confronted with a "hyperpressurized environment" but nonetheless does not have the luxury of proceeding in a deliberate fashion, the relevant question is whether the officer consciously disregarded a great risk of harm.

456 F.3d at 310.

The common feature of all these "mid-level" cases which gave rise to the aforementioned confusion is that they all involved circumstances where the defendant state actor was required to act with some degree of urgency – what the *Ziccardi* court described as the "need to act in a matter of hours or minutes," 288 F.3d at 65 -- as opposed to situations allowing an opportunity for relaxed and unhurried judgment. *See Miller, supra* (child welfare worker deciding whether to remove a child from parental home); *Ziccardi, supra (*EMTs responding to individual with serious back and neck injury*); Smith I and II, supra* (police officers responding to emotionally volatile individual who may be armed); *Rivas, supra* (EMTs responding to seizure victim); *Sanford, supra* (school guidance counselor dealing with potentially suicidal student). No claim is made here that Loftus faced similar time constraints relative to her challenged actions, and any belief to that effect on Loftus' part would have been objectively unreasonable.

Despite the confusion which developed in this circuit relative to mid-level culpability cases, the law of this circuit has been and remains consistent insofar as it

46

relates to cases involving deliberative, unhurried decision-making on the part of state officials.  In the realm of such cases, courts within this circuit have consistently applied the standard of "deliberate indifference," sometimes articulated as "willful disregard," both in state-created danger and non-state-created danger cases.  *See Kneipp*, 95 F.3d at 1208 ("willful disregard for the safety of the plaintiff"); *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 910 (3d Cir. 1997) ("willful disregard for or deliberate indifference to the plaintiff's safety"); *Nicini v. Morra,* 212 F.3d 798, 800-01 (3d Cir. 2000) (en banc); (substantive due process claim brought under "special relationship" theory applying deliberate indifference standard where child welfare worker had time for considered reflection); *Pahler,* 31 Fed. Appx. 69 (3d Cir. 2002) (culpability standard was willful disregard for or deliberate indifference to plaintiff's safety that rises to the level of shocking the conscience); *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572 (3d Cir. 2004) (deliberate indifference standard applied).  Indeed, even after the court's ruling in *Miller*, which arguably gave rise to some of the confusion concerning mid-level culpability standards, it remained clear that the lowest level of culpability in substantive due process cases – i.e, that which would give rise to liability in cases of unhurried state action – was "deliberate indifference."  *See Miller*, 174 F.3d at 377 (articulating three possible standards to determine whether behavior rose to the level of conscience-shocking conduct:  1) deliberate indifference; 2) gross negligence or arbitrariness that indeed "shocks the conscience"; 3) and *intent* to cause harm).  These three standards were cited with approval by the court of appeals in *Smith I,* a state-

created danger case.  *See also Sanford*, 456 F.3d at 306 (acknowledging *Miller's* three culpability standards).[13]

Furthermore, the concept of "deliberate indifference" was well defined as of March 2004.  As the Third Circuit Court of Appeals noted in *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000),

> While the term deliberate indifference is generally defined to require only knowledge of a serious risk of harm, *see Fuentes v. Wagner*, 206 F.3d 335, 345 n. 12 (3d Cir. 2000) (defining deliberate indifference in the context of a prisoner's Eighth Amendment claim), it also implies a failure to take reasonably available measures to reduce or eliminate that risk. *See Farmer v. Brennan,* 511 U.S. 825, 847 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (holding that "a prison official may be held liable under the Eighth Amendment … only if he knows that inmates face a substantial risk of serious harm and disregards that risk *by failing to take reasonable measures to abate it.")* (emphasis added).

219 F.3d at 275.  Based on the foregoing authority, a reasonable official in Loftus' position would have known that affirmative conduct on her part which exposed one or more of her cheerleaders to a substantial risk of serious harm they otherwise would not have faced and which displayed a deliberate indifference to that risk of harm would amount to a substantive due process violation.

---

[13] To the extent we can discern any confusion within this circuit relative to the appropriate culpability standard in deliberative circumstances, it stems from the mistaken assumption on the part of some courts that *Lewis's* shocks-the-conscience standard applied only outside of the deliberative context where quicker decision-making was required on the part of the state actor.  *See, e.g., Brown v. Commonwealth of Pennsylvania, Dept. of Health Emergency Medical Services Training Institute,* 318 F.3d 473, 480 (3d Cir. 2003) (discussing *Lewis, Miller, and Ziccardi* and "deriv[ing] from these cases the principle that the 'shocks the conscience' standard should apply in all substantive due process cases if the state actor had to act with urgency.").  The implication of such a view is that conduct which is deliberately indifferent could suffice to establish substantive due process liability even if the deliberate indifference was not "conscience-shocking."  But to the extent this view of the law created confusion and/or misapplied *Lewis'* principles, it had the effect of essentially lowering the culpability bar and, in doing so, placed state actors like Loftus on a heightened notice of potential liability in substantive due process cases.  Thus, any confusion in the law concerning this point could not have supported an objectively reasonable belief on Loftus' part that her conduct, if deliberately indifferent, nevertheless comported with the standards of substantive due process.

Defendants also contend that qualified immunity is appropriate because of a substantial conflict in federal court precedent concerning whether the state created danger theory can apply in a case involving harm that is not the result of third party violence or misconduct. Citing to *Pope v. Trotwood-Madison City Sch. Dist. Bd. of Educ.*, 162 F. Supp. 2d at 811-12 (S.D. Ohio), Defendants argue that, under the line of precedent identified by the court in that case, "which prevailed at the time of Plaintiff's accident and which remains viable today," the state created danger theory could only be applied where the state actor placed the plaintiff in greater risk of harm from private acts of violence committed by a third party.

Whatever the viability of this principle may be in other circuits, however, it is not the law of this circuit, and was not as of the time of Plaintiff's injury. Indeed, *Kneipp* itself did not involve harm inflicted by a third-party actor. Rather, in that case, the alleged harm resulted from police officers allowing a pedestrian who was obviously severely intoxicated to walk home alone on a cold night after initially stopping her for causing a disturbance. Having been left by the police to continue her journey home, the pedestrian wound up unconscious at the bottom of an embankment, resulting in hypothermia and permanent brain damage. Moreover, the appellate court decisions of this circuit have phrased the inquiry more generally in terms of whether the state actor affirmatively increased the risk of harm to the plaintiff in some manner. See *Sanford v. Stiles*, 456 F.3d at 304 (noting that, in *Kneipp*, the court "confirmed that liability may attach where the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process") (emphasis in the original); *Scheiber v. City of Philadelphia,* 320 F.3d 409, 416 (3d Cir. 2003) ("this and

other courts have read [*DeShaney*] to indicate that a constitutional violation may occur when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention"); *Sciotto, supra* (viable state-created danger claim involved injury to wrestler resulting from unintentional harm inflicted by larger, older wrestler); *Susavage, supra* at *14 (state created danger claim arising out of death to handicapped child due to misapplication of child restraint harness).

Lastly, Defendants make the general argument that no precedential opinion from the Third Circuit Court of Appeals existed as of March 3, 2004 which had established liability against a teacher or school coach under a state-create danger theory as would have given fair notice to Loftus that her actions would be unconstitutional. At the same time, Defendants contend that *Sciotto* is of no illustrative value because – according to Defendants, it has been criticized, is against the weight of existing authority, and is merely a district court opinion. Implicit in Defendants' argument is the contention that only binding decisions by our Court of Appeals can constitute "clearly established law." However, our circuit court of appeals has not precluded consideration of district court rulings in deciding whether a constitutional right is "clearly established" for qualified immunity purposes. *See Doe v. Delie*, 257 F.3d 309, 321 (3d Cir. 2001) ("District court opinions may be relevant to the determination of when a right was clearly established for qualified immunity analysis.").

In addition, our court of appeals has "adopted a broad view of what constitutes an established right of which a reasonable person would have known." *Burns v. County of Cambria, Pa.*, 971 F.2d 1015, 1024 (3d Cir. 1992) (citations and quotations marks

50

omitted).  Accordingly, in this circuit "there does not have to be 'precise factual correspondence' between the case at issue and a previous case in order for a right to be 'clearly established,' and we would not be 'faithful to the purposes of immunity by permitting … officials one liability-free violation of a constitutional or statutory requirement.'" *Kopec v. Tate,* 361 F.3d 772, 778 (3d Cir. 2004) (holding that police officers could be liable for a Fourth Amendment violation after employing excessive force in the course of handcuffing an arrestee, despite the fact that there had been no prior Supreme Court or Third Circuit ruling to that precise effect).

Finally, the case which Defendants point to as having criticized *Sciotto,* namely, *Yatsko v. Berezwick,* No. 3:06cv2480, 2008 WL 2444503 (M.D. Pa. June 13, 2008), was decided in 2008, some four years after the date of Plaintiff's injury.  Thus, *Yatsko* is irrelevant for qualified immunity purposes because it did not form part of the legal landscape defining Plaintiff's substantive due process rights as of the date in question. In any event, however, we do not agree with Defendants' assertion that *Sciotto* is in conflict with the weight of authority concerning state-created danger theory; in fact, that decision has been followed by another district court evaluating a state-created danger case in the school setting, albeit one decided shortly after Plaintiff's date of injury.  *See Hillard v. Lampeter-Strasburg School Dist.*, No. Civ. A. 03-2198, 2004 WL 1091050 (May 13, 2004) (denying summary judgment challenge to state-created danger claim premised upon bodily injury which student sustained as a result of her teacher's athletic training lesson involving the taping of fellow students to a classroom wall).

Based on the case law discussed at length herein, I conclude that the Plaintiff's right to substantive due process in the context of the state-created danger doctrine was

clearly established by the law of this circuit as of March 3, 2004 such that a reasonable official in Loftus's position would have understood that her conduct, under the circumstances of this case, violated that right. Accordingly, Defendants' motion for summary judgment will be denied with respect to Plaintiff's §1983 claim against Loftus.

**B**.

Plaintiff has also asserted a §1983 claim against the Iroquois School District. We now consider that claim.

As a municipal subdivision, the Iroquois School District can be subject to liability under § 1983 as a "person." *See Cabria-Diaz v. Penn Kider Campus Jim Thorpe School Dist.,* No. Civ. A. 3:08-2192, 2010 WL 5818289 (M.D. Pa. Aug. 9, 2010) (citing authority); *Picarella v. Terrizzi,* 893 F. Supp. 1292, 1297 (M.D. Pa. 1995) (citing authority). To impose municipal liability on a school district under §1983, however, the plaintiff must show that a school district policy or custom caused the plaintiff's injury. *Wicks v. Lycoming County*, 456 Fed. Appx. 112, 115 (3d Cir. 2012) (*quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). This requires a plaintiff to show that "through its deliberate conduct, the school district was the moving force' behind the injury alleged." Id. (emphasis in original). In addition, the plaintiff must show that the school district acted with deliberate indifference to the plaintiff's rights. *See Doe v. Luzerne County,* 660 F.3d 169, 179 (3d Cir. 2011).

A municipal policy exists "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Chizmar v. Borough of Trafford,* 454 Fed. Appx. 100, 106 (3d Cir. 2011) (*citing Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) (alteration in

the original).  A municipal custom exists where "a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  *Id.* (citing *Watson*, 478 F.3d at 156).

There is some disagreement between the parties as to whom we should consider the relevant policy-maker for purposes of assessing Plaintiff's municipal liability. Defendants insist that the School Board is the only relevant policy-maker as to any decision that was made on the part of the School District relative to the high school cheerleading program.  Plaintiff, on the other hand, contends that a "strong argument can be made on the existing record that the School Board delegated to Mr. Vogt [the High School Athletic Director] the final decision-making authority, at least as to program equipment requests, sufficient to bind the Iroquois School District for his decisions and actions in rejecting Defendant Loftus' multiple requests for new safety mats for the cheerleaders' use in stunting practice."  (Pl.'s Br. in Opp. to Summ. Judg. [44] at p. 51.) Ultimately, I need not resolve this conflict because, regardless of who is identified as the final decision-maker relative to Loftus' requests for better matting, I find that the challenged "policy" cannot support a claim for municipal liability.

As we have discussed, the Iroquois School District can only be held liable under §1983 if the School District itself caused Plaintiff's injury.  *Camiolo v. State Farm Fire and Cas. Co.*, 334 F.3d 345, 363 n. 13 (3d Cir. 2003).  To make such a showing, Plaintiff must establish "'a direct causal link between a [School District] policy or custom and the alleged constitutional deprivation,' … such that the municipality was the 'moving force' behind the constitutional deprivation alleged."  *Id.* (*citing City of Canton v. Harris*, 489 U.S. 378, 385 (1989) and *Board of the County Commissioners of Bryan County v.*

*Brown*, 520 U.S. 397, 404 (1997)). *See Connick v. Thompson,* --- U.S. ---, 131 S. Ct. 1350, 1359 (2011) (local governments are responsible only for "their own illegal acts," and, therefore, plaintiff seeing to establish municipal liability must prove "that 'action pursuant to official municipal policy' caused their injury")(citations omitted).

Here, the specific policy decision being challenged is Vogt's refusal to allocate funds for better matting in the LGI room or alternatively, to provide greater access to the high school gym, where better matting was available. It cannot be said, however, that this policy decision was the moving force behind the Plaintiff's injury. Rather, the cause of Plaintiff's alleged constitutional injury was Loftus' affirmative conduct in introducing the squad to a new, more challenging stunt in an unsuitable environment – a stunt which required the Plaintiff, a relatively inexperienced flier, to be airborne at a height of perhaps ten feet or more, to perform a 360 degree rotation in mid-air, and to be caught by her fellow cheerleaders, all of which collectively exposed Plaintiff to an increased chance of an off-balance landing over a hard surface. Although Vogt's refusal to supply higher quality matting may have been a factor that ultimately contributed to Plaintiff's injury, it was not the "moving force" behind Plaintiff's injury because ultimately, it was Loftus, not Vogt, who made the determination to proceed with the introduction of the stunt under dangerous conditions. *See VanTassel v. Brooks,* 355 F. Supp. 2d 788, 801 (W.D. Pa. 2005) ("but-for" causation is not sufficient to establish municipal liability under §1983) (citing authority).

Similarly, Plaintiff has not produced sufficient evidence to show that Vogt's decision amounted to deliberate indifference to her substantive due process rights. Vogt's challenged actions essentially involve discretionary budgetary decisions which

do not reflect a deliberate indifference to the rights of the Plaintiff, particularly in the absence of any evidence to suggest that Vogt was aware of Loftus' plans to introduce the twist-down cradle – and all of the attendant risks associated therewith -- on the day in question.  Budgetary decisions of this kind do not reflect deliberate indifference for purposes of establishing municipal liability under § 1983.  S*ee Collins v. City of Harker Heights,* 503 U.S. 115, 128-29 (1992) ("Decisions concerning the allocation of resources to individual programs, ... and to particular aspects of those programs, such as the training ... of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country."); *Pahler v. City of Wilkes-Barre*, 31 Fed. Appx. 69, 72 (3d Cir. 2002) (city police officer who was accidentally shot by fellow officer during a police raid could not demonstrate deliberate indifference on the part of municipality simply by showing that city officials intentionally chose, for budgetary reasons, not to utilize a specially trained Emergency Services Unit) (citing *Collins, supra*).

Nor can the School District's liability be established on the basis of an allegedly deliberately indifferent "custom" or policy on the part of the School Board of Directors. Gary W. Foster, President of the School Board during the time in question, has denied any knowledge of complaints, prior to the date of Plaintiff's injury, concerning unsafe practices by the high school cheerleading squad or Loftus in particular.  Furthermore, Plaintiff has failed to point us to any evidence suggesting that the School Board was on

notice of Loftus' unsuccessful attempts to obtain better mats for her squad or her intention to introduce the twist-down cradle under unsafe conditions.[14]

Plaintiff's municipal liability claim fares no better when we consider her other possible theories. Plaintiff suggests, for example, that the School District should be liable because the Board failed to fulfill its statutory duty to "prescrib[e], adopt[,] and enforce[e] reasonable rules and regulations for the management, supervision, control and prohibition" of its cheerleading program." 24 P.S. § 5-511. Relatedly, Plaintiff argues that the School District did nothing "to require a proactive system or process for identifying and addressing risk and safety concerns and thereby promote safety throughout its programs." (Pl.'s Br. in Opp. at p. 49.)

---

[14] Notice cannot be imputed to the Board based on Plaintiff's observation that "Mr. Foster, Mr. Uplinger [the High School Principal], and Mr. Vogt had each seen the IHS cheerleaders perform their two-person high stunts, including basket tosses, at basketball games and acknowledged their awareness of the risk of serious injury." (Pl.'s Br. In Opp. at p. 51.) As Plaintiff has argued elsewhere, cheerleaders perform stunts at basketball games without matting, but presumably they do so only after the stunt in question has been suitably mastered so as to reduce the risk of serious injury to the squad members. Therefore, awareness on the part of these school officials that stunting was performed at basketball games cannot be construed as knowledge that Plaintiff was being exposed during practices to the kind of unsafe conditions which ultimately led to her injury.

I am also not persuaded by Plaintiff's suggestion that notice of Loftus' unsuccessful attempts to secure better matting should be imputed to the Board as a whole because of the fact that Loftus' husband served as a School Board member during the time period at issue here. Plaintiff insists that further discovery on this point is warranted because of Mr. Loftus' invocation of the spousal communication privilege during his deposition. I do not agree. Even if we assume that Loftus informed her husband of her various unsuccessful attempts to acquire better matting, Mr. Loftus' own personal knowledge of the matter cannot be legally imputed to the Board at large, and it is unduly speculative to assume, as Plaintiff does, that Mr. Loftus must have shared this information with the board members. Such an inference is especially inappropriate in light of the fact that Mr. Loftus expressly disavowed any knowledge or recollection of Board meetings where the cheerleading program or requests for new matting were discussed. (See Depo. of Thomas Loftus [51-2] at p. 17.) Moreover, counsel could have inquired of Mr. Loftus whether he personally had any conversations with Board members concerning the issue of matting for the cheerleading program. Although the spousal communication privilege would not have covered such conversations (because the disclosure to third parties presumably would have waived the privilege), this topic was not explored.

Here again, though, the record cannot support a finding that the alleged policy was the causal agent of Plaintiff's alleged substantive due process injury. "Where … a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 394-95 (1989). No such finding is supportable on this record.

Furthermore, no reasonable jury could find the School District liable under §1983 based on the District's decision to hire Loftus and/or its alleged failure to properly train her. Our Court of Appeals has recently reminded us that, in order for a plaintiff to establish a viable §1983 claim premised upon a municipality's hiring decision, the plaintiff would have to demonstrate that "'scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right.'" *Li Min v. Morris,* 445 Fed. Appx. 574, 576 (3d Cir. 2011) (quoting *Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 411 (1997)).

Here, the record would not support such a finding. The record does show that Loftus' first involvement with the IHS cheerleading program was as a parent volunteer. In 2002, she was hired by the School District as a "co-advisor," serving alongside another parent volunteer by the name of Sue Fisher. Loftus was hired by the School Board as cheerleading co-advisor upon the recommendation of Vogt, who was her immediate boss. Mrs. Fisher later relinquished the position of co-advisor, leaving Loftus as the head "coach" or "advisor" for the 2003-2004 school year. No facts have been

presented by Plaintiff that could reasonably establish that the violation of squad members' substantive due process rights was a "plainly obvious consequence of the decision to hire" Loftus.

Insofar as Plaintiff is asserting a failure by the School District to properly train Loftus, such a theory is equally unavailing. The Supreme Court has recognized that, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1359 (2011) (*citing Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *id,* and, to establish such culpability, it must be shown that the "municipality's failure to train its employees in a relevant respect … amount[s] to 'deliberate indifference to the rights of persons with whom the (untrained employees) come into contact.'" *Id.* (*quoting Canton*, 489 U.S. at 388) (second alteration in the original). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360 (*citing Canton*, *supra*, at 407). In such circumstances, "[t]he city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Id.* (*citing Canton*, supra, at 395) (O'Connor, J., concurring in part and dissenting in part). The Supreme Court has cautioned that,

any "less stringent standard of fault" under a failure-to-train theory "would result in de

facto *respondeat superior* liability on municipalities ...." *Id.* (*quoting Canton* at 392).

In practical terms, this means "[a] pattern of similar constitutional violations by

untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for

purposes of failure to train." *Connick,* 131 S. Ct. at 1360 (citing *Bryan Cty.*, 520 U.S. at

409). As the Supreme Court has explained:

> [p]olicymakers' "continued adherence to an approach that they know or
> should know has failed to prevent tortious conduct by employees may
> establish the conscious disregard for the consequences of their action —
> the 'deliberate indifference' — necessary to trigger municipal liability." …
> Without notice that a course of training is deficient in a particular respect,
> decisionmakers can hardly be said to have deliberately chosen a training
> program that will cause violations of constitutional rights.

*Id.* at 1360 (internal citation omitted). Here, a review of the record yields no evidence of

prior substantive due process violations suffered by members of the IHS cheerleading

squad, much less the Board's notice of such violations as would support a municipal

liability claim premised on the School District's failure to adequately train Loftus.

Nor does the record support the type of "single-incident" liability "hypothesized in

*Canton."  Connick,* 131 S. Ct. at 1361. The Supreme Court expounded on this theory

as follows:

> In *Canton*, the Court left open the possibility that, "in a narrow range of
> circumstances," a pattern of similar violations might not be necessary to
> show deliberate indifference. *Bryan Cty., supra,* at 409, 117 S. Ct. 1382.
> The Court posed the hypothetical example of a city that arms its police
> force with firearms and deploys the armed officers into the public to
> capture fleeing felons without training the officers in the constitutional
> limitation on the use of deadly force. *Canton, supra,* at 390, n. 10, 109 S.
> Ct. 1197. Given the known frequency with which police attempt to arrest
> fleeing felons and the "predictability that an officer lacking specific tools to
> handle that situation will violate citizens' rights," the Court theorized that a
> city's decision not to train the officers about constitutional limits on the use

of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty.*, *supra*, at 409, 117 S. Ct. 1382. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

131 S. Ct. at 1361.

Here, the facts, even when construed most favorably to Plaintiff, do not place this case within the narrow range of situations where "single-incident liability" could reasonably be found. Cheerleading coaches such as Loftus are not akin to the hypothetical untrained police officer who, armed with a deadly weapon, must foreseeably make split-second decisions regarding the limits of acceptable force and who presumably lacks the means to obtain the necessary training on his own. Rather, any decisions Loftus had to make concerning new drills or maneuvers for her squad occurred with the luxury of deliberative thought and the ability to consult knowledgeable or authoritative sources for guidance. Because the foreseeability of constitutional harm to Loftus' squad members was not so patently obvious as that described in *Canton,* I find no basis upon which the record could support a finding of "single-incident" liability.

In sum, I find that the facts of record, construed in the light most favorable to Plaintiff, fail to establish a viable §1983 claim against the School District premised upon the District's failure to properly train Loftus. The alleged failure to train Loftus was neither the cause of the Plaintiff's alleged constitutional injury nor a display of deliberate indifference to her rights. Accordingly, summary judgment will be entered in favor of the School District.

## IV.    CONCLUSION

Based upon the foregoing reasons, the Defendants' motion for summary judgment will be denied insofar as it relates to Plaintiff's §1983 claim against Defendant Loftus and granted insofar as it relates to Plaintiff's claims against the School District. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HEATHER HINTERBERGER,    )
                       )
          Plaintiff,     )     Case No. 1:08-cv-317-SJM
        v.               )
                       )
IROQUOIS SCHOOL DISTRICT  )
and SALLY LOFTUS,        )
                       )
         Defendants.    )

## ORDER OF JUDGMENT

AND NOW, *to wit,* this 26th Day of September, 2012, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS ORDERED that Defendants' renewed motion for summary judgment [75] shall be, and hereby is, GRANTED in part and DENIED in part as follows:

1. Said motion is DENIED insofar as it relates to Plaintiff's §1983 claim against Defendant Sally Loftus; and

2. Said motion is GRANTED insofar as it relates to Plaintiff's §1983 claims against the Iroquois School District.

In accordance with the foregoing, IT IS ORDERED that JUDGMENT shall be, and here by is, ENTERED in favor of the Iroquois School District and against Plaintiff Heather Hinterberger as to Counts II and VI of the Amended Complaint.


                                      s/     <u>Sean J. McLaughlin</u>

                                        Sean J. McLaughlin
                                        United States District Judge

Cm: All counsel of record.